Edward A. Atlas v. Commissioner.
Atlas v. Commissioner
Docket No. 2319.
United States Tax Court
1945 Tax Ct. Memo LEXIS 318; 4 T.C.M. (CCH) 111; T.C.M. (RIA) 45044; January 27, 1945
Edgar W. Pugh, Esq., 3353 Penobscot Bldg., Detroit, Mich., for the petitioner. Philip M. Clark, Esq., for the respondent. SMITH Memorandum Findings of Fact and Opinion SMITH, Judge: This proceeding is for the redetermination of a deficiency of $31,424.53 in petitioner's income tax for 1940. The questions in issue are whether the petitioner realized taxable income in 1940 when *319 he surrendered bonds which he had purchased at a discount and acquired title to certain real estate which had been held by the trustee bank as security on the bonds; whether the gain, if any, is taxable in part as a long-term capital gain; and the basis of the property in petitioner's hands for depreciation purposes. Findings of Fact The petitioner is a resident of Detroit, Michigan. He filed his income tax return for 1940 with the collector of internal revenue at Detroit. Prior to December, 1927, Ethel Atlas, petitioner's wife, owned real estate in Detroit, Mich., known as Fort Hubbard Apartments. On December 29, 1927, she obtained a loan on the property of $65,000 from the Bankers Trust Co., of Detroit, giving the bank a promissory note for that amount with interest at six percent per annum. The note was payable $3,000 on January 1, 1930, $3,500 on January 1, 1931, $3,500 on January 1, 1932, and $55,000 on January 1, 1933, and was secured by a first mortgage on the property. The bank then issued and sold to the public certain bonds, series M-1184, in the amount of $65,000, which purported to assign to the purchasers a proportional undivided interest in the note and mortgage. *320 A specimen bond reads as follows: "MORTGAGE NO. 3004 "SERIES NO. M-1184 CERTIFICATE NO. 25 BANKERS TRUST COMPANY OF DETROIT (hereinafter designated 'The Company') "IN CONSIDERATION OF the sum of ONE HUNDRED Dollars which amount is hereinafter designated 'The Principal' paid to it by the bearer hereof, hereinafter designated 'The Holder,' receipt of which is hereby acknowledged, does hereby sell, assign, transfer and set over to the Holder, subject to the conditions hereinafter set forth, a proportional undivided interest in that part of a certain note maturing January 1, 1933 of such note dated December 29, 1927 given by ETHEL ATLAS to BANKERS TRUST COMPANY OF DETROIT for the sum of SIXTY-FIVE THOUSAND ($65,000.00) DOLLARS payable as follows: $3,000.00 January 1st, 1930; $3,500.00 January 1st, 1931; $3,500.00 January 1st, 1932; $55,000.00 January 1st, 1933, with interest, said note being secured by real estate mortgage, given by said payor to said payee, of even date with said note, and recorded in the office of the Register of Deeds for Wayne County, Michigan, Registration Number 825577 of Mortgages, and a like proportional interest in such mortgage, retaining however *321 the right to bring any suit or other proceeding deemed proper to enforce payment of said note or foreclosure of said mortgage in event of default in any of the terms of said mortgage. "TO HAVE AND TO HOLD such undivided interest in such note and mortgage to the Holder hereof, subject however, to the conditions hereinafter stated, mutually agreed to by the Company and the Holder hereof: "1st. This assignment is one of a series of like assignments of undivided interests in said note and mortgage issued or to be issued by the Company, which assignments do not and shall not in the aggregate exceed the face value of said note and mortgage, and shall pro rate with such other assignments and shall be neither superior nor inferior but simultaneous and coordinate with such other assignments. "2nd. The Holder irrevocably appoints the Company his, her or its agent and authorizes the Company in its own name: "(A) To receive, collect and give acquittance for the sums owing upon said note and mortgage as they mature, and upon full payment to discharge such mortgage from record. "(B) To collect, receive, adjust, compound and give acquittance for any claim for loss or damage by fire to the *322 mortgaged premises. "(C) To exercise any of the rights, privileges or options in said mortgage given to the mortgagee. "(D) To institute any legal or equitable suit or proceedings necessary or requisite to carry out the authority granted. "3rd. The Company agrees with the Holder: "(A) To cause the mortgagors to maintain fire insurance and pay all taxes upon the mortgaged premises as in the mortgage provided, and if default be made, to pay such taxes and effect such insurance and save the Holder harmless from any default of the mortgagors therein. "(B) To hold said note and mortgage separate and apart upon its books for the benefit of the Holders of assignments of this series until all assignments mature or are paid as herein provided. "(C) The 'Principal' of this assignment shall be due to the Holder on presentation of this certificate simultaneous with the maturity of the installment of said note and mortgage in part hereby assigned. "(D) The Company shall pay the Holder the Principal as and when collected from said note and mortgage, but in any event within eighteen months after demand of the Holder made to the Company subsequent to the due date of the Principal fixed *323 in the preceding paragraph on surrender of this certificate. "(E) The Company will pay the Holder interest upon the Principal according to the coupons hereto attached on presentation of such coupons at its office at maturity. "(F) The Company will, if this certificate is presented for payment on the due date fixed in subdivision 'C' of the paragraph, and not then paid because of non-payment of such note and mortgage pay the Holder interest on the Principal from such due date until paid at the rate of four per cent per annum. "4th. The Company shall bear all expenses of the agency and in the handling and collection of said note and mortgage and shall keep and retain for its services all sums received by it from said note and mortgage over and above the amounts to be paid to the Holder under paragraph 3 hereof as compensation for its services. "5th. The Holder shall present the certificate to the Company at its office for payment at maturity and in default of presentation thereof, the Principal shall be deposited with the Company as a trust deposit for the benefit of the Holder and interest thereon shall cease. "6th. This certificate of assignment may be registered on the books *324 of the Company and unless so registered and noted hereon, the Company may deem and treat the Holder (Bearer) of this certificate as absolute owner of such certificate for the purpose of receiving payment thereof and for all other purposes and shall not be affected by any notice to the contrary. "7th. Upon sixty days' notice, 'The Company' reserves the option to repurchase the interest transferred by this assignment on any interest period date after one year from date of mortgage upon payment of par and accrued interest, and a premium of one (1%) per cent if repurchased before maturity. "8th. The conditions and stipulations herein contained shall bind the successors, heirs and assigns respectively of the Company and the Holder. "IN WITNESS WHEREOF, The Company has caused this instrument to be executed by two of its officers, duly authorized to act in behalf of the Company, and its corporate seal to be hereto affixed, this 1st day of January, 1928." The coupons on the bonds carried interest at the rate of 4 percent per annum. By 1932 the principal amount of the bonds issued had been reduced to $61,000. By reason of vacancies in the apartments the income from the property *325 was not sufficient to pay taxes and expenses thereon and interest on the bonds. The result was that the bonds sold in the open market at large discounts. In 1932 petitioner acquired $2,000 face value of the bonds at a cost of $700. In 1935 the mortgagee bank foreclosed on its mortgage on the property and bid the property in at public sale for $70,000. A sheriff's deed to the property was given to the bank dated May 20, 1935. On the following day the bank executed a quitclaim deed conveying the property to itself as trustee for the benefit of the holders of the unpaid bonds. The equity of redemption of the prior owner, Ethel Atlas, expired on May 21, 1936. By that time the petitioner had acquired $37,177.50 face value of the bonds at a cost of $9,495.27. He continued to pick up the bonds when he could at a price of about 50 cents on the dollar. Prior to April 4, 1938, the petitioner had acquired $56,200 face value of the bonds at a cost of $20,282.77. From April 4, 1938, to October 4, 1938, he acquired $1,100 of the bonds at a cost of $548 and between October 4, 1938, and December 31, 1939, $3,700 of the bonds at a cost of $2,600. The total cost to him of all the bonds was $23,430.77. *326 After 1936 the petitioner operated the Fort Hubbard Apartments under a leasehold arrangement with the Bankers Trust Co. by which he was obligated to pay and did pay to the bank a rental of $55 per month. In 1937 petitioner, through a nominee, Jacob Behrmann, brought suit in the Circuit Court for Wayne County, Mich., in Chancery, against the Bankers Trust Co. and the minority bondholders for a "division, partition or sale" of the property and an accounting on all sums distributable to the owners of the beneficial interest in the property. Petitioner represented that he was then the owner of $41,000 face value of the $61,000 of bonds outstanding. The Circuit Court for Wayne County entered a decree on February 8, 1940, directing Bankers Trust Co. to convey the legal title of the property to the petitioner. The decree reads in part as follows: "5. That title to the said lands [Fort Hubbard Apartments], premises and property was taken by the said Bankers Trust Company of Detroit for the equal and pro rata use and benefit of and in trust for all the owners and holders of the outstanding bonds of the said Series M-1184. * * * * *
"8. That the said Bankers Trust Company of *327 Detroit is acting as Trustee for the benefit of the owners and holders of the said bonds and that the beneficial ownership of the property lies with the holders and owners of the said bonds issued under the said mortgage executed as aforesaid. That plaintiff being the holder and owner of all of the outstanding bonds and certificates of participation executed under said mortgage designated as Series M-1184, beneficial ownership lies in the plaintiff and the defendant Bankers Trust Company of Detroit, a Michigan corporation, holds the legal title to the property in trust for the plaintiff. That the said defendant, Bankers Trust Company of Detroit, a Michigan corporation, has executed its trust and there is no longer any necessity for a trustee of said premises. * * * * *
"NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED: "(a) That the legal title to the lands, premises and property hereinafter described is owned by the Bankers Trust Company of Detroit, a Michigan corporation, free and clear of any and all liens and encumbrances except City, State and County taxes and except special assessments in trust, however, for the use and benefit of the plaintiff as the owner *328 and holder of all of the outstanding bonds of Bankers Trust Company of Detroit, Series M-1184. "(b) That the purposes of the trust having been executed and the Trustee having no further duties in said trust, the trustee shall convey its legal title in and to the property hereinafter described to the plaintiff, who is the owner of the beneficial title to the said property, or his assigns. "(c) That the defendant, Bankers Trust Company of Detroit, shall convey by its deed the premises hereinafter described and that in default thereof a copy of this Decree may be recorded in the office of the Register of Deeds for Wayne County and when so recorded, this Deed shall act as a complete conveyance from the Bankers Trust Company of Detroit, a Michigan corporation, as Trustee to the plaintiff or his assigns, of the said premises. "(d) That the plaintiff shall take the said property subject to any and all unpaid City, County, and State taxes and any special assessments thereon. "(e) That upon making conveyance of the property involved herein to the plaintiff, the said defendant, Bankers Trust Company of Detroit, a Michigan corporation, individually and as Trustee, shall be forever absolved *329 and discharged from any and all liability by reason of said Trust. "(f) That the plaintiff or his assigns shall take said lands, premises and property free and clear of any and all claims, rights, title and interest of the defendant, Bankers Trust Company of Detroit, a Michigan corporation, either in its individual capacity or as agent or trustee, either for fees, expenses, and advancements or otherwise and all former owners and holders of said bonds of Series-1184, known or unknown, or any person by or through or under them or any of them, and the Court hereby reserves jurisdiction to enter such further Orders that may be necessary herein or appropriate to vest the plaintiff or his assigns with full and complete title to the said lands, premises and property." Pursuant to the Court's decree the Bankers Trust Co. of Detroit on April 4, 1940, executed a quitclaim deed to the property to petitioner and his wife. Coincident therewith the petitioner surrendered all of the bonds to the bank and was given a receipt for them dated April 4, 1940. In connection with his acquisition of the property petitioner paid attorneys' fees and trustee's commissions and expenses in the amount of *330 $1,795.50, which amount added to the cost of the bonds, $23,430.77, makes the petitioner's total investment in the property $25,226.27. In his audit of petitioner's return for 1940, the respondent determined that petitioner realized a gain, which was taxable at the short-term capital gain rates, on the acquisition of the Fort Hubbard Apartments property in that year of $73,312.50, the full value of the property as determined by respondent, at the time petitioner acquired it. The respondent further determined that petitioner's cost basis of the property for depreciation purposes was that amount, less "acquisition costs" of $1,795.50, less the fair market value of the land, which he valued at $18,328.15. In explanation of his inclusion of the full amount of the fair market value of the property in petitioner's taxable income respondent stated in his deficency notice that no satisfactory evidence had been submitted with respect to the cost to petitioner of the bonds exchanged therefor. Opinion The respondent's position here is that petitioner acquired the real estate in question in the taxable year 1940, in exchange for the bonds which he had purchased over a period from 1932 *331 to 1940, and that he realized a gain, taxable at the short-term capital gain rate, measured by the difference between the cost of the bonds and the fair market value of the property at the time of such exchange. The parties have stipulated that petitioner's bonds had a cost of at least $17,733, and on the evidence of record we have found a total cost of $23,430.77. It is petitioner's contention that he did not acquire the property in 1940 in exchange for the bonds but that he acquired it in part in 1936 by reason of the foreclosure sale, to the extent of the bonds which he then owned, and in part over the years 1936 to 1939, inclusive, as he purchased the remaining bonds. He contends that the bank held legal title to the property merely as trustee for the bondholders and that the transfer of legal title to him in 1940, as the holder of all the bonds, converted his equitable ownership of the property into complete ownership, without any resulting tax liability. It has been held that a taxable gain may result from the receipt of payment of a note or bond whether or not the transaction constitutes a "sale or exchange" within the meaning of section 111 (c) (Recognition of Gain or Loss) *332 or section 117 (Capital Gains and Losses), Revenue Act of 1938 and Internal Revenue Code. See Helvering v. Roth, 115 Fed. (2d) 239, and Elverson Corporation v. Helvering, 122 Fed. (2d). 295, affirming 40 B.T.A. 615. In the latter case the court said (Judge Learned Hand speaking for the court): * * * Whenever anyone surrenders a thing of value for another thing of value, the surrender will for tax purposes ordinarily close the transaction by which he acquired the thing surrendered, and normally he will "realize" a gain or loss. For example, if he exchanges property for property, he will close the transaction by which he obtained the property which he transfers, and the "amount realized" will be the market value of the property he receives. § 111 (b) * * * We think that petitioner's surrender of his bonds to the bank contemporaneously with his acquisition of the deed to the property closed the transaction as pertaining to the bonds and that petitioner's taxable gain on the transaction was the difference between his investment in the bonds of $23,430.77, plus acquisition costs of $1,795.50, or a total of $25,226.27, and the stipulated fair *333 market value of the property received, namely, $70,000. Section 117 (f), Internal Revenue Code, is as follows: SEC. 117. CAPITAL GAINE AND LOSSES. * * * * *
(f) Retirement of Bonds, Etc. - For the purposes of this chapter, amounts received by the holder upon the retirement of bonds, debentures, notes, or certificates or other evidences of indebtedness issued by any corporation (including those issued by a government or political subdivision thereof), with interest coupons or in registered form, shall be considered as amounts received in exchange therefor. We think that the surrender of the $61,000 bonds, Series M-1184, for the Fort Hubbard Apartments was the equivalent of the retirement of the bonds by the Bankrs Trust Co. The gain to the petitioner upon such transaction was the difference between the cost of the bonds, $23,430.77, and the stipulated fair market value of the Fort Hubbard Apartments received, $70,000, less the fees, commissions and expenses amounting to $1,795.50, or a net gain of $44,773.73. The amount of the gain attributable to each period is the difference between the cost of the bonds acquired in such period and an aliquot *334 portion of the net amount received upon surrender of the bonds, $70,000 less $1,795.50, or $68,204.50. It follows that the basis of the property in petitioner's hands for depreciation purposes is its market value on the date of acquisition by petitioner, $70,000, less the value allocable to the land, $10,160. The parties have stipulated that the proper rate for computing depreciation is four percent. Decision will be entered under Rule 50.